O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FRANCES GALLARDO, | ) | Case No. CV 18-09835 DDP (AFMx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER GRANTING DEFENDANTS' MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| COUNTY OF SAN LUIS OBISPO, ET AL., | ) | |
| | ) | |
| | ) | [Dkt. 29] |
| Defendants. | ) | |

On January 9, 2017, San Luis Obispo (SLO) County Senior Deputy Sheriff Gregory Roach responded to a trespassing call involving Decedent Josue Gallardo ("Gallardo"), who was reported to be driving a gray Cadillac sedan. (Declaration of Gregory Roach ¶¶ 16, 18.) Although Gallardo had left the scene by the time Roach arrived, Roach did encounter a gray Cadillac sedan nearby, and determined that the car was registered as a rental. (Id. ¶ 23.) Roach also learned that Gallardo had an outstanding arrest warrant for a misdemeanor domestic battery charge, was violating a restraining order, was currently on probation for domestic battery, and had consented to search as a condition of probation. (Id. ¶ 21.)

1    Approximately two weeks later, in the early morning hours of
2  January 24, 2017, Roach and Deputy Sheriff Jonathan Calvert
3  ("Calvert") were on patrol on Highway 101 when they observed a gray
4  Cadillac sedan that appeared to be the same vehicle Roach had
5  observed two weeks prior. (Roach Decl. ¶ 25.)  Roach ran the plates
6  and confirmed that the car was a rental, identified the driver as
7  Gallardo, then instructed Calvert to pull Gallardo over because
8  Gallardo had an arrest warrant and had consented to probation
9  searches.  (Id. ¶¶ 26-28.)  According to Calvert, Gallardo appeared
10  agitated, "and was potentially a methamphetamine user."
11  (Declaration of Jonathan Calvert ¶ 19.)
12    Once Gallardo pulled over, Calvert exited his police car and
13  approached the driver's side of Gallardo's vehicle with his firearm
14  drawn. (Exhibit H in Support of MSJ ("Video").) After radioing in
15  the incident, Roach then exited the police car and walked towards
16  the passenger side of Gallardo's vehicle, also with gun drawn.
17  (Id.) Calvert ordered Gallardo to show his hands.  (Id.)  Gallardo
18  first asked, "Why?" before then complying with Calvert's repeated
19  command.  (Id.)  Gallardo then said, "Shoot me, I don't care," to
20  which Calvert responded, "I don't want to shoot you, I don't know
21  you."  (Id.)  Gallardo then complied with Calvert's instruction to
22  turn off the car.
23    Calvert then said, "Because of the way you're acting, I want
24  you to get out of the car and lay on the ground right now."  (Id.)
25  A brief colloquy ensued.  Although the entirety of the conversation
26  is not audible, Calvert later stated that Gallardo again asked
27  Calvert to shoot him.  (Calvert Decl. ¶ 28.)  Calvert responded, "I
28  don't want to shoot you," and holstered his weapon.  (Video.)  By

1  this point, Roach had approached the passenger side and was looking

2  at Gallardo through the passenger-side window with a flashlight.

3  (Id.)

4     After further protest from Gallardo, Calvert again drew his

5  firearm and asked whether Gallardo had a gun. (Id.)  Gallardo

6  responded, "A gun?"  Calvert asked the question again, then

7  instructed Gallardo to show his hands.  (Id.)  Gallardo did not

8  comply, and Calvert began to back away from the driver's side door

9  toward the rear of the vehicle.  (Id.)  Approximately five seconds

10 after Calvert instructed Gallardo to show his hands, the brake

11 lights activated and the driver's side door began to open.  (Id.)

12    According to Roach, Gallardo was moving his hand furtively

13 toward his right pants pocket as he conversed with Calvert.  (Roach

14 Decl. ¶ 33.)  Roach saw Gallardo quickly pull a handgun out of his

15 pants pocket in a gripped firing position and move the gun to his

16 left toward Calvert.  (Id. ¶ 34.)  Roach immediately fired several

17 rounds into the car at Gallardo while moving backward away from the

18 car.  (Id. ¶ 38; video.)  At that point, Calvert also fired his

19 weapon into the car toward Gallardo.  (Calvert Decl. ¶ 32; video.)

20    After backup units and medical personnel arrived, Roach and

21 Calvert again approached the vehicle.  Both observed a handgun on

22 Gallardo's lap.  (Calvert Decl. ¶ 39; Roach Decl. ¶ 44.)   No

23 photographs of the gun were taken, however, before Roach removed

24 the gun from the vehicle.[1]  (Exhibit I in support of motion ("SLO

25 video")).  Roach then confirmed that Gallardo was not breathing and

26

27 _____

28    [1] The weapon was a BB-gun replica of a Walther PPK.
   (Declaration of James Voge ¶ 18.)

1  had no pulse.  (Roach Decl. ¶ 44.)  Medical personnel pronounced
2  Gallardo dead at the scene.  (Id.)

3      Investigators later discovered that Gallardo had recently
4  purchased the gun found in the vehicle, had posted images to social
5  media of himself holding the gun to his head, made statements to
6  numerous people indicating an intent to commit suicide, was seen
7  listening to a police scanner shortly before the encounter with
8  Calvet and Roach, and left a suicide note in the trunk of the
9  vehicle.  (Declaration of James Voge.)  Investigators also
10  discovered alcohol and cocaine in Gallardo's blood.  (Id.)

11      Gallardo's widow and successor in interest, Plaintiff Frances
12  Gallardo, filed the instant suit alleging several civil rights
13  claims against Calvert, Roach, SLO County, the SLO County Sheriff's
14  Department, and the SLO County Sheriff, in his official capacity.
15  Defendants now move for summary judgment on all claims against
16  them.[2]

17  **II.  Legal Standard**

18      Summary judgment is appropriate where the pleadings,
19  depositions, answers to interrogatories, and admissions on file,
20  together with the affidavits, if any, show "that there is no
21  genuine dispute as to any material fact and the movant is entitled
22  to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party
23  seeking summary judgment bears the initial burden of informing the
24  court of the basis for its motion and of identifying those portions

25  _____

26  [2] Plaintiff's eighth cause of action is alleged only against
    Doe Defendants, and Defendants do not address that claim.
27  Plaintiff has also indicated that she will dismiss her Third Claim
    for Denial of Medical Care and all Monell claims.  At oral
28  argument, Plaintiff expressed an intention to dismiss the eighth
    cause of action as well.

1    of the pleadings and discovery responses that demonstrate the

2    absence of a genuine issue of material fact.  See Celotex Corp. v.

3    Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

4    the evidence must be drawn in favor of the nonmoving party.  See

5    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the

6    moving party does not bear the burden of proof at trial, it is

7    entitled to summary judgment if it can demonstrate that "there is

8    an absence of evidence to support the nonmoving party's case."

9    Celotex, 477 U.S. at 323.

10       Once the moving party meets its burden, the burden shifts to

11   the nonmoving party opposing the motion, who must "set forth

12   specific facts showing that there is a genuine issue for trial."

13   Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

14   party "fails to make a showing sufficient to establish the

15   existence of an element essential to that party's case, and on

16   which that party will bear the burden of proof at trial."  Celotex,

17   477 U.S. at 322.  A genuine issue exists if "the evidence is such

18   that a reasonable jury could return a verdict for the nonmoving

19   party," and material facts are those "that might affect the outcome

20   of the suit under the governing law."  Anderson, 477 U.S. at 248.

21   There is no genuine issue of fact "[w]here the record taken as a

22   whole could not lead a rational trier of fact to find for the

23   nonmoving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

24   Corp., 475 U.S. 574, 587 (1986).

25       It is not the court's task "to scour the record in search of a

26   genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275,

27   1278 (9th Cir. 1996).  Counsel have an obligation to lay out their

28   support clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d

1026, 1031 (9th Cir. 2001).  The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found."  Id.

**III. Discussion**

    A.   Excessive Force

    Many of Plaintiff's claims are premised on the contention that Roach and Calvert's use of deadly force against Gallardo was unreasonable and excessive.  In Fourth Amendment excessive force cases, the question is whether police officers' actions are objectively reasonable given the totality of the circumstances. Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).  The officers' underlying intent and motivations are not pertinent. Graham v. Connor, 490 U.S. 386, 396–97 (1989).  Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, (1) whether the suspect posed an immediate threat to anyone, (2) whether the suspect resisted or attempted to evade arrest, and (3) the severity of the crime at issue.  Id. at 396.  Of these, the most important factor is whether the suspect posed an immediate threat to anyone's safety.  Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  Only information known to the officers at the time the conduct occurred is relevant.  Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546–47 (2017); Glenn v. Washington Cty., 673 F.3d 864, 873 n.8 (9th Cir. 2011).  The use of deadly force is only reasonable if a suspect "poses a significant threat of death or serious physical injury to the officer or others."  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014) (emphasis added) (internal quotation

1  omitted).  Although "the mere fact that a suspect possesses a
2  weapon does not justify deadly force," "where a suspect threatens
3  an officer with a weapon such as a gun or a knife, the officer is
4  justified in using deadly force."  Hayes v. County of San Diego,
5  736 F.3d 1223, 1233 (9th Cir. 2013) (internal alteration omitted);
6  Smith v. City of Hemet, 394 F.3d 689, 704 (9th Cir. 2005); see also
7  Cruz v. City of Anaheim, 765 F.3d 1076, 1078 (9th Cir. 2014) ("It
8  would be unquestionably reasonable for police to shoot a suspect .
9  . . if he reaches for a gun in his waistband.")
10      The central question in the instant case, therefore, is
11  whether a rational trier of fact could conclude that Gallardo,
12  contrary to Roach's version of events, did not draw a gun on
13  Calvert.  Having reviewed the evidence submitted by the parties,
14  the court concludes that no reasonable factfinder could reach such
15  a conclusion.
16      "[S]ummary judgment should be granted sparingly in excessive
17  force cases," especially "where the only witness other than the
18  officers was killed during the encounter."  Gonzalez v. City of
19  Anaheim, 747 F.3d 789, 795 (9th Cir. 2014)  In deadly force cases,
20  the Decedent is, of course, not able to contradict the shooting
21  officers' account of events.  Accordingly, this Court must
22  carefully examine all evidence in the record, including
23  circumstantial evidence that might discredit the officers' story,
24  "to determine whether the officer's story is internally consistent
25  and consistent with other known facts."  Id. (quoting Scott v.
26  Henrich, 39 F.3d 912, 915 (9th Cir. 1994); Cruz, 765 F.3d at 1079-
27  80.  In this case, however, the record includes video of the entire
28  incident.  Although the video is not conclusive as to certain

questions, such as whether Gallardo indeed had a gun in his pocket or on his lap, the video is consistent with Roach and Calvert's version of events.  Nor do there appear to be any material inconsistencies between the two deputies' stories.[3]

Plaintiff nevertheless contends that there is a genuine dispute of fact, primarily because Plaintiff's expert, Dr. Jesse Wobrock, conducted a "biomechanical analysis" indicating that Gallardo was not reaching for a gun in his pocket or pointing a gun at anyone.  (Wobrock report at 8-9.)  Dr. Wobrock's "analysis," however, appears to consist solely of a reconstruction of bullet trajectories.[4]  There does not appear to be any methodology linking Dr. Wobrock's trajectory analysis to the relevant conclusions, including an opinion that the right front pocket "would be a very unusual spot to keep a gun" and that Gallardo was attempting to comply with Calvert's orders.  Indeed, all of Dr. Wobrock's conclusions appear to be premised on the fact that all but one of the shots that hit Gallardo did so from the rear.  That fact, however, is in no way inconsistent with Calvert and Roach's descriptions or with the video, which shows both deputies firing as they retreat away from Gallardo's vehicle.  Dr. Wobrock's opinion is not admissible, let alone sufficient to create a triable issue

_____

[3] Although Calvert did testify at his deposition that the windows of the car were hard to see through from five to seven feet away, that testimony is not inconsistent with Roach's statement that he was able to see Gallardo through the passenger side window at close range with a flashlight.  Video evidence confirms that Roach was shining a flashlight into the vehicle from close range.

[4] Wobrock's analysis does not include any opinion about the sequence of bullet impacts.  Wobrock does opine, however, that one shot to the front of Gallardo's leg likely occurred after previous shots, as Gallardo involuntarily turned his body toward the passenger side.

1    of fact.   See Fed. R. Evidence 702; Daubert v. Merrell Dow

2    Pharmaceuticals, Inc., 509 U.S. 579, 589 n.7, 595 (1993).

3         Nor, contrary to Plaintiff's argument, is this case comparable

4    to Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001).   There,

5    over a dozen officers responded to a situation involving a

6    disturbed suspect who was obviously suicidal.   Deorle, 272 F.3d at

7    1280.   The shooting officer observed the suspect for up to ten

8    minutes, before eventually firing when the suspect advanced, at a

9    steady gait, with a bottle or can in hand.   Id. at 1281.   Those

10   circumstances differ greatly from those here, where the evidence

11   indicates that Gallardo drew a seemingly lethal weapon at close

12   range and without warning.   Furthermore, although Plaintiff's

13   comparison appears to be rooted in officers' knowledge of a

14   suspect's disturbed mental state, Plaintiff has cited no admissible

15   evidence that Roach knew that Gallardo was suicidal, pointing only

16   to a letter from the SLO County District Attorney stating that

17   Gallardo had expressed suicidal desires to Roach in November of

18   2016.[5]

19        Plaintiff's only other argument appears to be that the lack of

20   photographic evidence of the gun in Gallardo's lap calls into

21   question Calvert and Roach's statement that the gun was, in fact,

22   recovered from Gallardo's lap.   The plentiful evidence of

23   Gallardo's history with the gun, however, precludes any genuine

24   dispute as to whether deputies planted the weapon.   Furthermore, to

25   the extent Plaintiff suggests that Defendants may have, contrary to

26

27        [5] Roach states in his reply declaration that the District
     Attorney's letter appears to mistakenly assume that statements made
28   to Roach's partner at the time were made to Roach as well.   (Roach
     reply dec. ¶¶ 3-8.)

1  their version of events, recovered the weapon from some other

2  location in the vehicle, video evidence does not support

3  Plaintiff's theory.  The post-shooting video shows Roach again

4  approaching Gallardo's vehicle, opening the door, reaching quickly

5  into the driver's area of the vehicle with his left hand, and then

6  recovering and removing the gun almost immediately, within

7  approximately two seconds.  (SLO video.)  Roach's left shoulder

8  remains outside the vehicle, as does his head, which remains above

9  the roofline of the vehicle.  (Id.)  The video evidence is,

10  therefore, entirely consistent with Roach's declaration.  No

11  reasonable trier of fact could rely upon the absence of photographs

12  of the gun in Gallardo's lap to conclude that Gallardo did not draw

13  a gun on Calvert.[6]

14       Although defendants in deadly force cases must meet a high bar

15  to obtain summary judgment, there is no triable issue here as to

16  whether Calvert and Roach's use of deadly force was objectively

17  reasonable.  Accordingly, Defendants are entitled to summary

18  judgment on all excessive force-based claims.

19       B.    Reasonable Suspicion for the Traffic Stop

20       Gallardo's Second Cause of Action alleges that Calvert and

21  Roach unreasonably detained Gallardo when they pulled him over.

22  There is no dispute, however, that there was an outstanding warrant

23  for Gallardo's arrest, and that Roach was made aware of that

24  warrant two weeks prior, when he responded to the January 7

25  trespassing call involving Gallardo.  Plaintiff glosses over this

26

27       [6] Plaintiff also points to deputy instructions not to take
pictures as evidence of some kind of conspiracy or cover up.  Those
28  instructions were given, however, after the gun was recovered.
(Exhibit E in opposition to motion at 12-13.)

fact, arguing in passing that "Roach and Calvert did not bother to even check" the warrant on January 24, and could not legitimately stop Gallardo without "actual, current knowledge." (Opp. at 22:19-20.) Plaintiff does not cite, nor is the court aware of, any authority for the proposition that police officers with knowledge of an outstanding arrest warrant must confirm the current validity of that warrant immediately prior to detaining a person.

Indeed, the Tenth Circuit has rejected a similar argument. In United States v. Hewlett, a defendant argued that an arresting officer lacked probable cause where eleven months had passed since the officer confirmed the existence of an arrest warrant. Hewlett, 395 F.3d 458, 461 (D.C. Cir. 2005). The court disagreed, reasoning that the circumstances, including an underlying murder charge, reduced the chance that the warrant was no longer valid. Id. at 462. Here, although Gallardo's offense conduct was far less significant than that of the defendant in Hewlett, so too was the time gap between the confirmation of the existence of the warrant and Gallardo's detention. Only two weeks had passed since Roach learned of the existence of the warrant, and Gallardo was driving the same rental car he had been driving while the warrant was outstanding. Although Gallardo theoretically could have already been arrested and released, and continued to rent or once again rented the same car, that likelihood was nowhere near high enough to deprive Roach of probable cause. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Second Cause of Action.[7]

---

[7] Having concluded that there was probable cause to pull (continued...)

## IV.    Conclusion

In all but the most compelling cases, decisions of liability in civil rights cases involving deadly force should rightly be left to juries.  To do otherwise erodes the confidence of the public in the integrity of the courts and in the continued viability of the Civil Rights Act.  This case, however, is one of those few compelling cases that cannot go forward.  That does not make it any less a tragedy.  A man lost his life, and the officers involved will forever have to live with the knowledge that they took a life. The officers were confronted with an impossible situation.  In hindsight, did they act perfectly?  No.  A man died.  In such situations there will always be room for after-the-fact criticisms. But there can be no dispute that Defendants acted reasonably under the circumstances, within the bounds of the law.  Therefore, for the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Dated: August 5, 2020

DEAN D. PREGERSON
United States District Judge

---

[7] (...continued)
Gallardo over, the court need not address Plaintiff's arguments regarding Gallardo's probation search condition and reasonable suspicion.

12